# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# NORTHERN DIVISION

**SAIDAH D. YOUNG**                                                                           **PLAINTIFF**

**V.**                                    **No. 3:19-cv-00021 LPR/PSH**

**ANDREW SAUL, COMMISSIONER OF**
**SOCIAL SECURITY ADMINISTRATION**[1]                                  **DEFENDANT**

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge Lee P. Rudofsky. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objections; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## I. Introduction:

This case has a complex procedural history, including a remand by this Court in 2007 and several other remands by the Appeals Council. In short, however, the Court finds that the ALJ's most recent decision was supported by substantial evidence in the record as a whole. Ms. Young was not always compliant with her doctors' recommendations (such as weight loss and exercise), she improved over the relevant time-period, and her most serious health problems were acute in nature, resolving with treatment. While the ALJ may have made some errors in his decision process, the Court finds that those errors were harmless.

---

[1] On June 6, 2019, the United States Senate confirmed Mr. Saul's nomination to lead the Social Security Administration. Pursuant to Fed. R. Civ. P. 25(d), Mr. Saul is automatically substituted as the Defendant.

## II. Procedural History:

Ms. Young filed her initial application on April 19, 2002, alleging a disability onset date of October 19, 2001. (Tr. at 586). She alleged disability based on irregular heart rate, fatigue, shortness of breath, and hypertension. *Id*. Ms. Young's applications were denied initially and upon reconsideration, and a hearing was held at her request on September 21, 2005, in front of Administrative Law Judge ("ALJ") Stimson. (Tr. at 17, 586).

On December 20, 2005, ALJ Stimson issued a decision finding that Ms. Young was not disabled. (Tr. at 17-22, 586). ALJ Stimson found that Ms. Young had severe impairments of ischemic heart disease and essential hypertension. (Tr. at 19). He found that she had the residual functional capacity ("RFC") to lift and carry 10 pounds occasionally and less than 10 pounds frequently and to stand/walk six hours and sit six hours in an eight-hour day, which qualified as "light" exertional level work, because of the standing and walking requirement.[2] (Tr. at 20). This meant that Ms. Young could return to her past relevant work as a typist/clerk/stenographer, a sedentary job.[3] *Id*. Thus, ALJ Stimson found that Ms. Young was not disabled. (Tr. at 21-22). She

---

[2] (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally (no more than 2 hours per day) and sitting totals 6 hours in an 8-hour work day.

(b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing (approximately 6 hours in an 8-hour work day), or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. *See Soc. Sec. Ruling* 83-10; https://www.ssa.gov/OP_Home/rulings/di/02/SSR83-10-di-02.html

[3] If an RFC provides for light work, it is presumed that the claimant can perform the lower exertional jobs in the sedentary category.

appealed her case to the Appeals Council, and on May 25, 2006, the Appeals Council denied her request for review of the hearing decision. (Tr. at 586-587).

Ms. Young filed a complaint in this Court disputing ALJ Stimson's decision, and United States District Judge Leon Holmes issued an Opinion and Order remanding the case for further review on September 17, 2007. (Tr. at 586-597); Case No. 3:06CV129 JLH (Sept. 17, 2007). In his Order, Judge Holmes instructed ALJ Stimson to: 1) further develop the record; 2) consider Ms. Young's obesity; 3) give good reasons for the weight ALJ Stimson accorded to the consultative medical opinions; 4) determine the physical demands of Ms. Young's past relevant work; and 5) consider whether she was entitled to benefits for a closed period of time, specifically in 2002 and 2003. (Tr. at 593-597). The Appeals Council officially remanded the case to ALJ Stimson on January 4, 2008. (Tr. at 599).

The next administrative hearing took place on December 30, 2008 (Tr. at 541). ALJ Stimson issued a decision denying Ms. Young benefits again on March 26, 2009. (Tr. at 541-548). In his decision, he found that Ms. Young had severe impairments of ischemic heart disease, essential hypertension, and right hip pain. (Tr. at 543). He assigned the same RFC as he assigned in the first decision, for light work. (Tr. at 544). Based on the RFC, he determined that Ms. Young could return to her past work as an editorial assistant or document specialist, both jobs in the sedentary exertional category. (Tr. at 547). Thus, ALJ Stimson concluded that Ms. Young was not disabled. (Tr. at 548).

The Appeals Council remanded the case again to ALJ Stimson on June 10, 2011. (Tr. at 562). The Appeals Council directed ALJ Stimson to: 1) give further consideration to all of the medical opinions, obtaining more medical evidence if necessary; 2) obtain an additional orthopedic medical assessment from a specialist; 3) further evaluate Ms. Young's RFC, and explain the weight

given to each medical opinion that addresses her RFC; and 4) if necessary, obtain supplemental evidence from a vocational expert ("VE") about the availability of jobs Ms. Young could perform. (Tr. at 563-564).

A third hearing was held in front of ALJ Stimson on January 24, 2012. (Tr. at 568). ALJ Stimson issued his decision denying benefits on June 14, 2012 (Tr. at 568-578). In his decision, he found that Ms. Young had the following severe impairments: ischemic heart disease, hypertension, and degenerative disease of the right hip. (Tr. at 571). He assigned Ms. Young an RFC for sedentary work. *Id*. ALJ Stimson found that Ms. Young could return to her past work as a transcriptionist and a document specialist, both sedentary jobs. (Tr. at 577).

The Appeals Council remanded the case for a third time, on June 30, 2014. (Tr. at 579-585). The Appeals Council directed the case to be heard by a different ALJ. *Id*. The remand order directed the new ALJ (ALJ Ingram) to: 1) give further consideration to Ms. Young's fatigue symptoms, obesity, and anemia; 2) obtain expert medical evidence if necessary; 3) give further consideration to all of the medical opinions in the record with respect to their RFC findings; 4) further evaluate whether Ms. Young could return to her past relevant work; and 5) if warranted, obtain VE testimony at Step Five. (Tr. at 584-585).

ALJ Ingram conducted the most recent hearing on June 16, 2015. (Tr. at 521-530). He issued a decision on July 23, 2015, finding that Ms. Young was not disabled prior to August 1, 2011, but was disabled and entitled to benefits from that date forward. *Id.* While Ms. Young's attorney claimed that he filed timely objections to that decision, the Appeals Council found those objections to be untimely (Tr. at 496); therefore, ALJ Ingram's decision now stands as the final decision of the Commissioner, and Ms. Young has requested judicial review. For the reasons stated below, the Court should affirm the decision of the Commissioner.

### III. The Commissioner's Decision:

The ALJ found that Ms. Young had not engaged in substantial gainful activity since the alleged onset date of October 19, 2001.[4] (Tr. at 523). At Step Two, ALJ Ingram found that prior to August 1, 2011, Ms. Young had severe impairments of obesity and right hip slipped subcapital epiphysis. (Tr. at 523). Beginning on August 1, 2011, Ms. Young had advanced osteoarthritis of the right hip as a severe impairment. *Id*. At Step Three, ALJ Ingram found that Ms. Young's impairments did not meet or equal a listed impairment. (Tr. at 524).

The ALJ found that prior to August 1, 2011, the date Ms. Young became disabled, she had the RFC to perform light work, except that she could only occasionally kneel, crouch, crawl, balance, or climb. *Id*. The ALJ identified Ms. Young's past relevant work as word processor (sedentary exertional level), medical transcriptionist (sedentary exertional level), and emergency room clerk (light exertional level). (Tr. at 528). He determined, based on the record and the demands of her past relevant work, that prior to August 1, 2011, Ms. Young was capable of performing her past relevant work. *Id*.

The ALJ found Ms. Young to be disabled beginning on August 1, 2011, due to hip problems set forth in the medical record. (Tr. at 528-529). She could not perform past relevant work or any other work in the national economy from August 1, 2011 forward. *Id*.

To summarize, ALJ Ingram found that Ms. Young was not disabled prior to August 1, 2011, but was entitled to benefits beginning on that date.

### IV. Discussion:

   A. Standard of Review

The Court's function on review is to determine whether the Commissioner's decision is

---

[4] From 2005 through 2007, Ms. Young worked as a contract transcriptionist from her home, but her earnings did not rise to the level of substantial gainful activity. (Tr. at 523-524).

supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ. *Miller*, 784 F.3d at 477. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019): "Whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence…is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court has reviewed the entire record, including the briefs, the ALJ decisions, the remand orders, the District Court Opinion and Order, and the transcripts of the hearings.

    B.   Ms. Young's Arguments on Appeal

Ms. Young contends that substantial evidence does not support the ALJ's decision to deny

6

benefits. She argues that ALJ Ingram did not comply with the Appeals Council's Remand Order of June 30, 2014. Specifically, she claims that he should have found ischemic heart disease to be a severe impairment, and that he did not properly weigh the expert medical opinions. She also asserts that ALJ Ingram should have obtained testimony from a VE before he made his determination that Ms. Young could return to past relevant work. Also, she says that the RFC exceeded Ms. Young's ability. And she argues that ALJ Ingram did not fairly evaluate her subjective complaints.[5] After reviewing the record as a whole, the Court concludes that the ALJ did not err in denying benefits for the time before August 1, 2011.

With respect to Ms. Young's hip condition, she only sought treatment once in a ten-year period from 2001-2011. (Tr. at 447-448). On November 2, 2005, she told Dr. William Blankenship, M.D., an orthopedist, that ibuprofen helped with her hip pain. *Id*. X-rays of the hips showed no degenerative changes in the left hip, with some narrowing of the cartilage in the femoral head in the right hip, but otherwise, normal findings.[6] *Id*. Because of infrequent treatment, improvement with over the counter medication, and mild objective findings prior to 2011, the ALJ correctly evaluated Ms. Young's hip problem as not disabling prior to August 1, 2011.

Ms. Young asserts that heart conditions, fatigue, anemia, and obesity rendered her disabled prior to August 1, 2011. She went to the ER at Parkland Hospital in Dallas in November and December 2001, with complaints of shortness of breath, productive cough, and heavy menses. (Tr.

---

[5] Ms. Young did not address whether she should have been entitled to benefits for a closed period of time, but for the reasons set out below, the Court concludes that the ALJ did not err in that respect.

[6] Dr. Blankenship incorrectly transcribed the x-ray results at p. 448, writing *left hip* when it should have said *right hip*. (Tr. at 448). That error does not impact the decision in this case, because it is clear in later records, and in ALJ Ingram's decision, that the right hip was the source of Ms. Young's disabling conditions after August 1, 2011.

7

at 401-413). The doctor noted that she was 5'10" tall and weighed 298 pounds, which meant she was obese. (Tr. at 412). He also noted that she was not taking her medications as prescribed. *Id*. Failure to follow prescribed treatment may be used to discredit subjective allegations. *Brown v. Heckler*, 767 F.2d 451, 452 (8th Cir. 1985). An echocardiogram on December 18, 2001, showed serious heart problems, with severely depressed right and left ventrical systolic function, ejection fraction of less than 15%, severe tricuspid regurgitation, four-chamber enlargement, and moderate pericardial effusion. (Tr. at 401, 412). The diagnosis was anemia and congestive heart failure ("CHF"), and the doctor instructed Ms. Young to start Lasix and to follow up at the CHF clinic in 2-3 weeks. (Tr. at 404-413).

On January 9, 2002, Ms. Young reported to her doctor that she had shortness of breath, but no other complaints. (Tr. at 398). She was tolerating Lasix well and her CHF was improved. She was told to follow up in 2-3 months. *Id*.

Ms. Young went to the hospital on March 6, 2002, with a new onset of an atrial flutter and a dilated left ventricle. (Tr. at 389). She was diagnosed with inducible ischemia. *Id*. The nurse noted CHF as a Class III condition, she ordered a Holter monitor, and she increased Ms. Young's Lasix.[7] (Tr. at 391). She was encouraged to follow a healthy diet, and to follow up in one week. *Id*.

On March 28, 2002, Ms. Young was admitted to the hospital for an overnight stay because of one episode of atrial fibrillation ("AFib"). (Tr. at 225, 380). An echocardiogram at that time

---

[7] Class III heart condition is defined as: Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea. Class II means: Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath). http://www.heart.org/HEARTORG/Conditions

showed "dramatic improvement" of Ms. Young's pericardial effusion and ejection fraction. (Tr. at 175). She was started on Coumadin and discharged in good condition to follow up with the CHF clinic and the Anticoagulation clinic. *Id*. Examination was within normal limits except for the AFib. (Tr. at 225, 380). Normal examination findings are not indicative of disabling conditions. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001). Ms. Young was told to continue activities as tolerated. (Tr. at 424).

At a visit on April 8, 2002, Ms. Young's CHF was noted to be improving, and her AFib was stable. (Tr. at 374). Improvement in condition supports an ALJ's finding that a claimant is not disabled. *See Lochner v. Sullivan*, 968, F.2d 725, 728 (8th Cir. 1992). She was in no apparent distress, her lungs were clear to asculation, and clinical cardiac examination was normal. *Id*. She said she felt better. *Id*. Heavy bleeding was associated with perimenopause, and she was started on hormone therapy. *Id*. Coumadin was continued. *Id.* The need for only conservative treatment contradicts allegations of disabling pain. *Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993).

One set of clinic notes from April 12, 2002 showed a Class II heart condition and one showed a Class III heart condition.[8] (Tr. at 368-370). Ms. Young reported weight gain and increased appetite. *Id*. Echocardiogram showed no changes, cardiac exam was normal, Ms. Young was in no acute distress, and she was encouraged to lose weight and exercise. *Id*. A physician's recommendation to exercise suggests that a claimant has an increased functional capacity. *See Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009). She was told to follow up in one month. (Tr. at 368-370).

On April 18, 2002, she returned to the hospital for management of CHF, but had no

---

[8] By October 2002, Ms. Young's condition had improved to Class II per clinic notes. (Tr. at 239).

9

complaints of chest pain, dizziness, or shortness of breath. (Tr. at 366). Her lungs were clear to asculation. *Id.* She had a normal cardiac exam. *Id*. She had no problems doing her activities of daily living. *Id.*; *see Gray v. Apfel*, 192 F.3d 799, 804(8th Cir. 1999)(activities of daily living considered with other evidence can support a finding of not disabled).

In April 2002, Ms. Young visited the Anticoagulation clinic. (Tr. at 365-366). She had normal cardiac systems, and was continued on Warfarin. *Id*. The Holter monitor report showed no significant changes in her heart systems. (Tr. at 310-311).

On May 21, 2002, Ms. Young followed up at the CHF clinic with fatigue on exertion, but no chest pains, shortness of breath, or dizziness. (Tr. at 303-305). She was in no acute distress. *Id*. Cardiac examination was normal and her lungs were clear to asculation. *Id*. Stress test showed no changes diagnostic of ischemia, and perfusion study showed ejection fraction of 32%, up from 15%. (Tr. at 287). Left ventricle was globally depressed. *Id*. She was continued on a beta blocker. (Tr. at 303).

Ms. Young reported to the Anticoagulation clinic several times through July 2002. (Tr. at 284-301). Her cardiac systems were routinely normal. *Id.* In July 2002, Ms. Young reported two weeks of heavy menses. (Tr. at 283). On July 2, 2002, Ms. Young was hospitalized for anemia, and she was given two blood transfusions. (Tr. at 189-192). At that time, CHF was stable and hypertension was well-controlled. (Tr. at 190). She had no chest pain, shortness of breath, or dizziness. (Tr. at 192). A chest x-ray on July 2, 2002 showed that Ms. Young's cardiac silhouette was smaller than in prior x-rays. (Tr. at 202). EKG at that time showed normal sinus rhythm, minimal voltage, increased ventricular rate, and possible lateral ischemia. (Tr. at 427). Objective tests showing mild to moderate conditions do not support a finding of disability. *Masterson v.*

*Barnhart*, 363 F.3d 731, 738-39 (8th Cir. 2004).

On July 24, 2002, Ms. Young reported numbness and fatigue from anemia, which was specifically related to gynecology. (Tr. at 246). She canceled her gynecology appointment because it "was taking too long;" she also had planned an out of town trip, indicating she was feeling better. *Id*. Clinic notes show that CHF was stable at that time. *Id.* Ms. Young's weight was 268 pounds. (Tr. at 248). Ms. Young's doctor told her that her LDL cholesterol reading was low (good) so he suggested stopping Zocor. (Tr. at 245). She was told to follow up in 3-4 months. (Tr. at 248). At a July 30, 2002 visit to the Anticoagulation clinic, Ms. Young reported no bleeding since her last visit and she had normal cardiac systems. (Tr. at 242-243).

Ms. Young did not keep her September 2002 appointment with the CHF clinic. (Tr. at 241). Failure to keep doctors' appointments undermines credibility. *Lochner*, 968 F.2d at 729. On October 1, 2002, Ms. Young was hospitalized for endometrial polyps, and she had a hystroscopy and D&C shortly thereafter. (Tr. at 239). The clinic note showed non-ischemic cardiac condition, with Class II CHF; CHF was improved with beta blockers*. Id.* The note also showed only one episode of atrial flutter*. Id*. On November 6, 2002, less than 12 months after Ms. Young first went to the hospital for her problems, Ms. Young told the doctor at the CHF clinic that her energy level had improved. (Tr. at 232). She also had normal cardiac exam and was in no acute distress. *Id.* Also on that date, Ms. Young reported to the hospital nutrition clinic. She said she was compliant with a low sodium diet and was interested in losing weight and starting physical activity and cardiac rehab. (Tr. at 230). Her weight was 270 pounds. (Tr. at 229).

Because of heavy bleeding, Ms. Young was admitted to the hospital on November 10, 2002 for Coumadin reversal treatment. (Tr. at 227). She improved slightly with progesterone. (Tr. at

11

226). A clinic note said that Ms. Young was symptomatically stable with respect to hypertension, CHF, and AFib. (Tr. at 226). On December 3, 2002, Ms. Young reported that her current condition was good, and the clinic note said her prognosis was stable. (Tr. at 435).

In August 2003, Ms. Young's PCP told her to lose weight and "increase physical activity!!!" (Tr. at 443). She weighed 290 pounds. *Id.* In November 2003, he told her the same thing. (Tr. at 444). He said to follow up in 3-4 months. *Id.* In April 2004, her doctor told her to continue her current medications. (Tr. at 445).

There are six consultative medical opinions in the record. Bob Dodd, M.D., completed an RFC form on September 12, 2002. (Tr. at 218-225). Listed impairments were heart disease, anemia, and hypertension. (Tr. at 218). Ms. Young weighed 275 pounds. (Tr. at 225). Dr. Dodd found Ms. Young capable of light work. (Tr. at 218-224). He noted that there were no treating source opinions in the record. *Id*. He stated that Ms. Young's allegations of disability were not supported by the medical record. (Tr. at 223).

Dr. Blankenship, the orthopedist, evaluated Ms. Young on November 2, 2005. (Tr. at 447-453). He noted that she walked with a slight limp and used a cane. *Id*. He found her capable of sitting all day and standing or walking for 6 hours during the work day (light work). *Id*. She had no lifting or carrying limitations. *Id*. He said she could only occasionally climb, kneel. crouch, or stoop. *Id*. ALJ Ingram gave Dr. Blankenship's opinion great weight. (Tr. at 527).

Howard Chuang, M.D., a cardiologist, evaluated Ms. Young on November 10, 2005. (Tr. at 454-459). He observed that she was working as a typist. (Tr. at 458). He noted that she had gained 20 pounds in the last year and weighed 310 pounds; he said she "was very much overweight." (Tr. at 458-459). Dr. Chuang's notes said that Ms. Young tired easily and needed a

12

cane to walk, because it helped her to walk better. *Id.* She did not have shortness of breath, chest pain, or respiratory symptoms. *Id*. She was not anemic or in any respiratory distress. (Tr. at 459). Dr. Chuang diagnosed "probable hypertensive cardiovascular disease **without CHF**." (Tr. at 458-459). He limited Ms. Young to sedentary work, with standing or walking of less than two hours per day. (Tr. at 454-456). ALJ Ingram gave this opinion limited weight. (Tr. at 527).

Gary Nunn, M.D., a doctor of internal medicine, evaluated Ms. Young on August 23, 2011. (Tr. at 720-725). He found Ms. Young capable of sedentary work, but did not say upon what he based his opinion. *Id*.

Bernard Crowell, M.D., evaluated Ms. Young on August 23, 2014. (Tr. at 726-740). Among her problems were hip pain, hypertension, CHF and anemia. (Tr. at 726). She used a cane and walked with a slow gait. *Id*. He found severe osteoarthritis of the right hip. *Id*. He limited her to less than sedentary work. (Tr. at 728-740).

Veryl Hodges, D.O., evaluated Ms. Young on January 27, 2015. (Tr. at 739-748). Her main complaints were CHF and right hip pain. *Id*. She had a normal cardiac exam with some shortness of breath. *Id*. He diagnosed CHF, severe hip pain, obesity, and hypertension. (Tr. at 741). He said she was in need of a total hip replacement. (Tr. at 739). He limited her to less than sedentary work. *Id*.

Ms. Young argues that the ALJ erred by not finding ischemic heart disease to be a severe impairment (because prior ALJs had found ischemia to be a severe impairment), citing to law- of-the-case doctrine. *See Aguiniga v. Colvin*, 833 F.3d 896, 901 (8th Cir. 2016). The Court in *Aguiniga* made clear that when an administrative remand vacates prior decisions, as was done in this case (Tr. at 582), the instant ALJ is not bound by prior ALJ findings. *Id*. The Appeals Council

13

directed ALJ Ingram to review the record as a whole, obtain any necessary new evidence, and issue a new decision. (Tr. at 585). Moreover, neither Judge Holmes, nor the Appeals Council, instructed the ALJ to find ischemic heart disease to be a severe impairment.

The claimant has the burden of proving that an impairment is severe, which by definition significantly limits one or more basic work activities. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); 20 C.F.R. § 404.1521(a). A physical or mental impairment must last or be expected to last not less than 12 months. *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006). If the impairment would have no more than a minimal effect on the claimant's ability to do work, then it does not satisfy the requirement of Step Two. *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007).

First, while Ms. Young did experience CHF early on in the relevant time-period, she showed improvement on beta blockers. Her doctor said that CHF was Class II as of October 2002, which means she only had slight limitations on her functional ability. And Dr. Chuang, the cardiologist, ruled out CHF. She was diagnosed with inducible ischemia on March 26, 2002, but an ECG taken on July 5, 2002 showed "no changes diagnostic of ischemia." (Tr. at 341). On July 2, 2002, EKG showed smaller cardiac silhouette and she felt better and had more energy. (Tr. at 239). In October 2002, a clinic note reflected "non-ischemic heart condition." *Id*. Ms. Young did complain of being fatigued due to her heart condition, but she was morbidly obese throughout the time period, and did not heed her doctor's instructions to lose weight and exercise. Moreover, she said she could perform activities of daily living. (Tr. at 366). Her doctor told her to resume activities as tolerated. (Tr. at 424). She did not seek regular treatment with a cardiologist, but instead went to the ER when she had heart symptoms. She did not keep her September 2002

appointment with the CHF clinic. The ALJ did not list any heart condition as a severe impairment, and he did not err in so doing. Ms. Young did indeed have a heart condition, but her serious heart problems were acute in nature, they improved with medication, they did not require aggressive treatment, and they were exacerbated by Ms. Young's failure to comply with her doctor's recommendations to diet and exercise. Heart problems did not qualify as severe impairments for purposes of disability adjudication.

The ALJ properly considered anemia, obesity, and fatigue. Ms. Young did bleed heavily in 2002, and she required two blood transfusions. (Tr. at 189-192). But this was associated with gynecological changes, and at most of her visits to the anticoagulation clinic, she did not complain of bleeding. After she had gynecological surgery, she did not seek treatment for anemia.

With respect to obesity, ALJ Ingram referenced Ms. Young's height and weight, and pointed out that the medical record "did not reveal obesity-related complications such as uncontrolled CHF or restrictive lung disease that would impose ongoing disability functional limitations." (Tr. at 526). Her CHF was controlled and improved by beta blockers. ALJ Ingram *did* find obesity to be a severe impairment, which means he assessed the nature of the condition throughout the relevant time-period. (Tr. at 523). When an ALJ specifically discusses the claimant's obesity during the claim evaluation process, such review is sufficient to avoid reversal. *Brown ex rel. Williams v. Barnhart*, 388 F.3d 1150, 1153 (8th Cir. 2004). Obesity can lead to cardiac and pulmonary problems, but when Ms. Young presented to the ER over the relevant time-period, she typically was in no acute distress, and denied shortness of breath, dizziness, and chest pain. She had normal cardiac and pulmonary exams for the most part, especially after beginning to take medication. Her CHF was classified as Class II in October 2002.

15

Ms. Young complained of fatigue often, which required her to walk with a cane, but this could be attributed to being overweight, which her doctors told her to remedy with diet and exercise. She also said at various times in 2002 and 2003 that she felt better and had more energy. (Tr. at 374). She wanted to start physical cardiac rehab in November 2002. (Tr. at 230).

Ms. Young worked from home as a transcriptionist from 2005-2007, which indicates that she was capable of at least sedentary work. She claims she could not even do that level of work in 2002 and 2003 (Tr. at 780, 866), but as shown above, acute exacerbations in that time-period improved with treatment, and she was able to do some activities of daily living. No impairment during that period (heart conditions or anemia) lasted at a disabling level for the required period of 12 months, without some improvement over that time.

Ms. Young alleges that ALJ Ingram did not give proper weight to the medical opinions of record. It is the ALJ's function to review all of the medical evidence and resolve conflicts among the various treating and examining physicians. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). Where an opinion is only partially consistent with other evidence in the record, an ALJ may give significant weight to some aspects of the opinion while discounting portions of the opinion that are not supported. *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000). Moreover, the interpretations of a physician's findings is a factual matter left to the ALJ's authority. *See Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016).

ALJ Ingram discussed the state-agency reviewing medical consultants' opinions that Ms. Young was capable of light work. (Tr. at 527). He also thoroughly addressed the opinions of Dr. Blankenship (orthopedist) and Dr. Chuang (cardiologist). He may have erred by stating that the

opinion of an orthopedic should be given more weight that that of a cardiologist (Tr. at 527), but he still arrived at the correct conclusion that some of Dr. Chuang's opinion could be discounted. Dr. Chuang's opinion was undercut by Ms. Young's improvement in her heart condition, and by his own statement that she did not have CHF. (Tr. at 454-459). He limited her to sedentary work and said she needed a cane to walk, but he also said she did not have any shortness of breath or chest pain at the examination. *Id*. She was not anemic or in any respiratory distress. *Id*. An EKG showed no acute changes and a cardiac exam was normal. *Id*. Dr. Chuang said she was very much overweight, weighing the most she ever did during the relevant time-period (310 pounds). *Id*. His opinion that Ms. Young could walk and stand less than two hours a day was inconsistent with his own findings and with the medical record from 2002 and 2003 (two to three years prior to his examination). Still, ALJ Ingram gave some weight to Dr. Chuang's opinion and said Ms. Young could perform a limited range of light work and the full range of sedentary work prior to August 1, 2011. (Tr. at 527). ALJ Ingram did not address in much detail the medical opinions given after 2005, because they did not address Ms. Young's conditions during the 2002-2003 period in question (and in any event, ALJ Ingram found Ms. Young to be disabled based on opinions from 2011 forward). ALJ Ingram gave proper time and attention to the relevant medical opinions.

ALJ Ingram also assigned an RFC consistent with the limitations evident in the record as a whole. A claimant's RFC represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence. *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011). In determining the claimant's RFC, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of his impairments. *Ostronski v. Chater*,

17

94 F.3d 413, 418 (8th Cir. 1996).

As shown above, Ms. Young improved with treatment over the relevant time-period, did not require aggressive treatment, was not always compliant with her doctor's suggestions, and routinely appeared in no acute distress at her ER visits. The RFC for light work with postural limitations incorporated all credible evidence (and meant that she could perform sedentary work too). Ms. Young alleges she could not perform light work during the 2002-2003 period, but two of her past jobs were performed at the sedentary level, so the assigned RFC allowed for her to perform those particular jobs, in spite of her limitations. Perhaps ALJ Ingram could have determined Ms. Ingram was capable of only sedentary and not light work, but this Court's review is deferential, and the RFC for light work did not affect the final decision, because two of her past jobs were sedentary. Furthermore, an Eighth Circuit case found harmless error when the ALJ found the claimant could perform medium work when the jobs proposed were both light and medium jobs. *Adams v. Colvin*, 2015 U.S. Dist. LEXIS 153179 *8 (8th Cir. November 12, 2015)(*appeal taken from Adams v. Colvin*, No. 1:14-CV-00162-JTK (E.D. Ark. Nov. 12, 2015).

While Ms. Young claims that ALJ Ingram erred by not obtaining testimony from a VE at Step Four, VE testimony is not required at Step Four where the claimant retains the burden of proving she cannot perform her past work. *See Banks v. Massanari*, 258 F.3d 820, 827 (8th Cir. 2001). Because the ALJ properly classified Ms. Young's past work based on the Dictionary of Occupational Titles definitions, and he identified two past jobs as sedentary work, his determination at Step Four was well supported. No VE testimony was necessary.

Finally, Ms. Young's argument that the ALJ did not properly analyze her credibility is without merit. Social Security Ruling 16-3p, 2016 SSR LEXIS 4 ("SSR 16-3p"), removed the

word "credibility" from the analysis of a claimant's subjective complaints, replacing it with "consistency" of a claimant's allegations with other evidence. SSR 16-3p became effective on March 28, 2016, and the underlying analysis incorporates the familiar factors that were in place prior to the new ruling. *Martsolf v. Colvin*, No. 6: 16-cv-00348-NKL, 2017 U.S. Dist. LEXIS 2748 (W.D. Mo. Jan. 9, 2017). The ALJ must still give consideration to all of the evidence presented relating to subjective complaints, including: 1) prior work record; 2) the claimant's daily activities; 3) the duration, frequency, and intensity of pain; 4) precipitating and aggravating factors; 5) dosage, effectiveness and side effects of medication; and 6) functional restrictions. *Polaski v. Heckler*, 751 F.2d 943, 948 (8th Cir. 1984).

ALJ Ingram considered that Ms. Young admitted she stopped working in 2001 for reasons unrelated to disability. (Tr. at 524). He also considered that she was performing sedentary work during the period she alleged disability. *Id*. He noted infrequent treatment, conditions that improved over time, and relatively few symptoms at most of her ER visits. (Tr. at 524-530). He noted the lack of clinical findings to show a disability lasting 12 months or more prior to August 1, 2011. *Id.* Ms. Young also said she could perform activities of daily living, which undermined her claims. ALJ Ingram properly evaluated her subjective complaints.

While this case was long in duration and had a complex procedural history, the bottom line is that Ms. Young did not show that she was disabled for a period of at least 12 months during the time Judge Holmes identified in his remand Opinion and Order, or any time prior to August 1, 2011. ALJ Ingram complied with the multiple directives on remand, in a decision that considered and discussed the voluminous record in a clear manner.

## V. Conclusion:

There is substantial evidence to support the Commissioner's decision that Ms. Young was not disabled prior to August 1, 2011. ALJ Ingram did not err at Step Two, he properly assessed the medical opinions, his Step Four conclusion about past relevant work was proper, and he sufficiently addressed Ms. Young's credibility. The decision, therefore, should be affirmed. The case should be dismissed, with prejudice.

IT IS SO ORDERED this 12th day of December, 2019.

_____
UNITED STATES MAGISTRATE JUDGE